IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GERALD SQUIER,                  :      Civil No. 1:14-CV-1698
                                :
              Plaintiff,        :
                                :
      v.                        :
                                :      (Magistrate Judge Carlson)
CAROLYN W. COLVIN,              :
Acting Commissioner of          :
Social Security                 :
                                :
              Defendant.        :

## MEMORANDUM OPINION

### I.   INTRODUCTION

The plaintiff in this case, Gerald Squier, was 48 year old man with a documented history of severe spinal impairments, including degenerative disc disease of the lumbar and cervical spine. (Tr. 20.) Squier's spinal pain and disability has been the subject of opinions and medical documentation from three different treating sources. One of these treating sources, Dr. Mikhail Artamonov, opined in April of 2011, that Squier's pain and injuries resulted in "significant functional disability" for the plaintiff. (Tr. 676.) Another treating physician, Dr. Behzad Maghsoudlou, Squires' treating neurologist, has twice submitted impairment questionnaires in May and November of 2012 in which this physician expressed the view that Squier was

totally disabled due to this chronic back pain.  (Tr. 633-641, 642-649.)  While Dr. Maghsoudlou did not submit extensive clinical testing and treatment records in support of these medical findings and opinion, such clinical records exist, and were provided by Dr. Matt Vegari, a treating neurologist for Mr. Squier.  Dr. Vegari's medical records contained test results which documented multiple medically confirmed cervical and lumbar abnormalities, including multi-level lumbar disc bulging, spinal stenosis, multi-level cervical root tenderness, arthritic conditions, carpal tunnel syndrome, muscle spasms, tendonitis, and rotator cuff injuries.  (Tr. 600-626.)

In the face of this medical evidence from various treating sources, two of whom opined that Squier suffered a functional disability due to the back of neck injuries, the Commissioner points to no countervailing medical opinion evidence suggesting that Squier can work.  Indeed, it is undisputed that:  "The record does not contain an assessment of the claimant's physical limitations from a state agency medical consultant." (Tr. 27.)  Thus, the Administrative Law Judge was provided no medical evidence contradicting the opinions of these various treating sources.  Nonetheless, notwithstanding the lack of any medical opinion evidence supporting the contention that Squier could perform gainful activity on a sustained basis, the ALJ rejected these

treating source opinions, concluded that Squier retained the capacity to perform light work, and denied Squier's application for disability benefits. (Tr. 18-29.)

For the reasons set forth below, we conclude that this decision should be remanded to the Commissioner for further consideration of the existing medical evidence, and further development of the medical record, if necessary.

## II.   STATEMENT OF FACTS AND OF THE CASE

### A.   MEDICAL BACKGROUND

On July 13, 2013, Gerald Squier applied for Social Security Disability benefits, alleging that he had been disabled since April 8, 2011. (Tr. 161-167.) Squier was 48 years old at the time he alleged that his back, shoulder and neck pain, along with other complicating medical conditions left him disabled. (Tr. 44,161.)

In fact, significant evidence in the record of these proceedings documented that Squier suffered from a series of severe and painful neck, shoulder and back conditions. Thus in the Spring of 2011 Squier was seen, tested and treated by a neurologist, Dr. Matt Vegari, whose clinical findings documented a series of serious spinal problems for Squier.

When Squier was first seen by Dr. Vegari on April 15, 2011, he was complaining of chronic neck and low back pain. Squier's 2010 lumbar and cervical spine MRIs showed multi-level lumbar disc bulging with chronic arthritic changes

3

and facet hypertrophy, and cervical spine disc herniation with spinal canal stenosis at C5-6.  Squier presented with low back pain radiating to his right lower extremity and neck pain radiating to his bilateral upper extremities.  Neurological review of systems was positive for episodes of passing out (cardiology was unable to find the cause) and memory loss with episodes of staring/zoning out.  (Tr. 602.)

On examination, Squier appeared to be "in a chronic degree of pain and discomfort."  There was cervical and trapezius muscle spasm, limitation of neck movement to both horizontal planes, facet tenderness at C4-5 and C5-6, and multilevel cervical root tenderness along with lumbosacral paraspinal muscle spasm, lower lumbar facet tenderness, and sacroiliac joint tenderness bilaterally.  Neurological examination revealed reduced grip strength, bilaterally diminished ankle jerks, and bilaterally positive Tinel, Phalen, and crossed adductor signs.  Based upon this examination and testing Dr. Vegari's assessment was that Squier was experiencing:  (1) Displacement of lumbar intervertebral disc without myelopathy; (2) Displacement of cervical intervertebral disc without myelopathy; (3) Headache; (4) Carpal tunnel syndrome ("CTS"); (5) Cervical spinal stenosis; and, (6) Localization – related (focal)(partial) epilepsy and epileptic syndromes with complex partial seizures.  (Tr. 604.)

Further diagnostic testing was ordered and on April 19, 2011, an MRI of Squier's cervical spine revealed straightening of the normal lordosis which "can be frequently found in the setting of muscular spasm." At C4-5, there was a disc bulge mildly effacing the ventral theca. At C5-6, there was a broad-based disc protrusion associated with the disc and osteophyte complex effacing the ventral theca and compressing the ventral surface of the cord across the midline. There was moderately severe right-sided neural foraminal narrowing and moderately severe central canal stenosis. (Tr. 622.)

In a follow up appointment on May 12, 2011, Dr. Vegari noted that Squier remained "in a chronic degree of pain and discomfort." Examination was unchanged from April except there was also tenderness on palpation of Plaintiff's shoulders in the anterior joint line and positive joint tenderness. Hawkin's and cross-arm tests were positive. Abduction of the shoulders was limited to 30-45° with significant point tenderness at the anterior shoulder. Squier's left shoulder was also limited in internal and external rotation. (Tr. 605-606.) As a result of these tests, rotator cuff sprain/strain was added to Squier's diagnoses.

Further testing on May 17, 19 and 20, 2011, confirmed Squier's on-going spinal, neck and shoulder impairments. As a result of this additional testing, by June 9, 2011, Dr. Vegari assessed Squier as suffering from an array of back and neck

related medical impairments including:  (1) Displacement of lumbar intervertebral disc without myelopathy; (2) Intervertebral cervical disc disorder with myelopathy, cervical region; (3) Headache, cervicogenic; (4) Carpal Tunnel Syndrome; (5) Rotator cuff (capsule) sprain and strain; and, (6) Syncope and collapse. (Tr. 601.)

At the same time that he was being seen by Dr. Vegari, in 2011 Squier was examined and treated by Dr. Mikhail Artamonov, a pain treatment specialist.  Dr. Artamonov's clinical impressions of Squier were consistent with the test results obtained by Dr. Vegari, and included a finding of significant functional disability. Specifically, Dr. Artamonov's clinical impression was that Squier was experiencing a constellation of medical problems, including:  chronic spinal pain; spinal facet joint syndrome; Secondary myofascial pain syndrome; chronic cervicalgia; chronic intermittent opioid use; and "significant functional disability."  (Tr. 676.)

These medical findings, in turn, were consistent with the medical opinion of another one of Squier's treating physicians, Dr. Behzad Maghsoudlou, Squier's treating neurologist.  Dr. Maghsoudlou twice submitted impairment questionnaires in in May and November of 2012 in which this physician stated that Squier was totally disabled due to this chronic back pain.  (Tr. 633-641, 642-649.)  According to Dr. Maghsoudlou , in an eight-hour workday, Squier could sit for a total of less than one hour and stand or walk for a total of less than one hour.  Squier could only

occasionally lift or carry five pounds; was markedly limited in using his upper extremities for reaching and for grasping, turning or twisting objects.  He was moderately limited in performing fine manipulations; could not push, pull, kneel, bend or stoop; and was deemed unfit by the doctor for work in a full-time competitive job.  (Id.)

In the face of this body of clinical and medical opinion evidence, the Commissioner obtained no countervailing medical proof relating to the nature, severity and disabling impact of Squier's back and neck injuries.  Quite the contrary, in this case it is undisputed that:  "The record does not contain an assessment of the claimant's physical limitations from a state agency medical consultant."  (Tr. 27.)

It was against this clinical backdrop that Squier's disability claim came to be considered by an Administrative Law Judge.

## B.    ALJ PROCEEDINGS AND DECISION

Squier applied for Social Security Disability Insurance Benefits on July 13, 2013, alleging disability since April 8, 2011.  (Tr. 161-167.)  This application was denied on August 25, 2011, and Squier requested an administrative hearing on September 27, 2011.  (Tr. 137-142.)  A hearing was then held on December 13, 2012, before an Administrative Law Judge ("ALJ").   At this hearing, Squier and a vocational expert both appeared and testified.  (Tr. 38-77.)  Following this hearing,

on February 1, 2013, the ALJ issued a decision, denying Squier's application for disability benefits.  (Tr. 18-29.)

Applying the five-step sequential analysis which governs Social Security disability determinations, the ALJ found at step 1 that Squier met the insured status requirements of the Social Security Act at the time of his application.  (Tr. 20.)  At step 2, the ALJ found that Squier was experiencing a series of severe medical impairments, including "degenerative disc disease of lumbar and cervical spine with radiculopathy, history of right rotator cuff disorder, carpal tunnel syndrome and anxiety disorder."  (Tr. 20.)  At step 3, the ALJ concluded that Squier's disabilities did not meet any of the listed impairments prescribed by Social Security regulations.  (Tr. 21.)  The ALJ then concluded at step 4 that Squier was unable to perform any of his past relevant work due to the combined effect of these impairments.  (Tr. 27.)

However, at the final step of this sequential analysis, the ALJ found that Squier retained the residual functional capacity to perform a full range of light work, and was therefore not disabled.  (Tr. 28-9.)  The ALJ reached this conclusion even though there was no medical opinion evidence supporting this finding since:  "The record does not contain an assessment of the claimant's physical limitations from a state agency medical consultant."  (Tr. 27.)  Moreover, this conclusion was inconsistent with the medical opinion of Dr. Maghsoudlou who had twice submitted impairment

8

questionnaires in May and November of 2012 in which this physician stated that

Squier was totally disabled due to this chronic back pain.  (Tr. 633-641, 642-649.)

In his decision, the ALJ accorded this treating physician opinion "little weight", (Tr.

27.), noting that Dr. Maghsoudlou failed to submit medical records to support his

assessment.  The ALJ also cited discrepancies in the dates of treatment listed by the

doctor in these two impairment questionnaires, and concluded that the medical

opinion was unreliable because it was based upon an August 2010 MRI, stating that

there were no current MRIs in Squier's file from any treating source.  (Tr. 27.)

Thus, the ALJ's finding that Squier was not disabled is unsupported by any

medical opinion evidence, since no such evidence was submitted by the

Commissioner.  In addition, the ALJ's decision did not mention or discuss Dr.

Artamonov's finding that Squier was experiencing "significant functional disability."

(Tr. 676.)  Furthermore, the stated basis for rejecting the two medical opinions of

Squier's treating neurologist, Dr. Maghsoudlou, was suspect on several scores.  For

example,  ALJ's assertion that there were no MRI reports on file for Squier after

August 2010, was contradicted by the ALJ in his decision, which described the results

of MRIs undertaken in May 2011.  (Tr. 26.)  Likewise, the ALJ's citation to an

alleged discrepancy in Dr. Maghsoudlou's treatment history for Squier was clearly

explained by the ALJ in his opinion, where the ALJ stated that the doctor first saw

9

Squier in 2010 in the emergency room following an accident, and then renewed treatment of Squier in 2012.  (Tr. 26.)

### III.   DISCUSSION

#### A.   STANDARDS OF REVIEW–THE ROLES OF THE ADMINISTRATIVE LAW JUDGE AND THIS COURT

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the ALJ and this court.  At the outset, it is the responsibility of the ALJ in the first instance to determine whether a claimant has met the statutory prerequisites for entitlement to adult benefits.

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits.  See 20 C.F.R. §404.1520; see also Plummer  v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed any further.  See 20 C.F.R. §404.1520(a)(4).  As part of this analysis the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. Id.

10

Before considering step four in this process, the ALJ must also determine the claimant's residual functional capacity, or RFC.  20 C.F.R. §404.1520(e).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §404.1545.  In making this assessment, the ALJ considers all of the claimant's impairments, including any medically determinable non-severe impairments.  20 C.F.R. §404.1545(a)(2).  This disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ's disability determination must also meet certain basic procedural and substantive requirements.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for any disability determination.  Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  Cotter v. Harris, 642 F.2d

700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

The necessity of an adequate explanation by an ALJ of why evidence was rejected can be simply stated. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). As the United States Court of Appeals for the Third Circuit has observed: "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.' Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects. See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir.1983)." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). When reviewing the denial of disability benefits, we must simply determine whether

12

the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). It is less than a preponderance of the evidence but more than a mere scintilla of proof. Richardson v. Perales, 402 U.S. 389, 401 (1971).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427 (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.  However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  In determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather

13

must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).

### B. STANDARDS GOVERNING ASSESSMENT OF MEDICAL EVIDENCE AND COMPLAINTS OF PAIN

In large measure this case entails an evaluation of the ALJ's assessment of medical opinion evidence, in a setting where two treating sources, with varying degrees of clarity, defined Squier as suffering from a significant functional disability, and a third treating source provided testing data which confirmed the existence of multiple, chronic, painful back, shoulder  and neck conditions for Squier.  Further, in this case we must recognize that this treating source evidence is not contradicted by any other medical opinion evidence since:  "The record does not contain an assessment of the claimant's physical limitations from a state agency medical consultant."  (Tr. 27.)

The legal standards governing our assessment of an ALJ's evaluation of this type of evidence are familiar ones.  In Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."

14

Plummer [v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)] (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); see also Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1994); Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See Adorno, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Kent, 710 F.2d at 115.

Id. at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. § 416.927(c). When the opinion of a physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state:

Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will

15

give to the source's medical opinion.  When the treating source has seen
you a number of times and long enough to have obtained a longitudinal
picture of your impairment, we will give the source's opinion more
weight than we would give it if it were from a non-treating source.

20 C.F.R. § 416.927(c).

Additionally, the nature and extent of the doctor-patient relationship is
considered.  The Regulations state:

Generally, the more knowledge a treating source has about your
impairment(s) the more weight we will give to the source's medical
opinion.  We will look at the treatment the source has provided and at
the kinds and extent of examinations and testing the source has
performed or ordered from specialists and independent laboratories.  For
example, if your ophthalmologist notices that you have complained of
neck pain during your eye examinations, we will consider his or her
opinion with respect to your neck pain, but we will give it  less weight
than that of another physician who has treated you for the neck pain.
When the treating source has reasonable knowledge of your
impairment(s), we will give the source's opinion more weight than we
would give it if it were from a nontreating source.

20 C.F.R. § 416.927(c).

This case also entails evaluation of an ALJ's assessment of the plaintiff's
claims of chronic pain.  In assessing a claimant's allegations of pain, we begin by
recognizing that "[t]estimony of subjective pain and inability to perform even light
work is entitled to great weight."  Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d
Cir.1979) Given the "great weight" which this evidence should receive, an ALJ may
only "reject a claim of disabling pain where he 'consider[s] the subjective pain and

16

specif[ies] his reasons for rejecting these claims and support[s] his conclusion with medical evidence in the record.' <u>Matullo v. Bowen</u>, 926 F.2d 240, 245 (3d Cir.1990)." <u>Harkins v. Comm'r of Soc. Sec.</u>, 399 F. App'x 731, 735 (3d Cir. 2010).

Where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." <u>Hartranft v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999). Cases involving an assessment of subjective reports of pain "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." <u>Id</u>. In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's disability. Instead. at the outset, by statute the ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be

expected to produce the pain or other symptoms alleged and which, when considered with all the evidence. . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529 (a)-(c). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529 (a)-(c). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529 (a)-(c). Social Security Ruling 96-7p gives the following instructions in evaluating  the credibility of the claimant's statements regarding his symptoms: "In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's

statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p. SSR 96-4p provides that "Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s)." SSR 96-4p.

There is a necessary corollary to this rule governing ALJ treatment of medical evidence concerning a claimant's pain. It is also well-settled that:

> Because they are not treating medical professionals, ALJs cannot make medical conclusions in lieu of a physician: ALJs, as lay people, are not permitted to substitute their own opinions for opinions of physicians. This rule applies to observations about the claimant's mental as well as physical health. As the Seventh Circuit stated, "[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." Accordingly, "[a]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion." Nor is the ALJ allowed to "play doctor" by using her own lay opinions to fill evidentiary gaps in the record. Carolyn A. Kubitschek & Jon C. Dubin,

Social Security Disability Law and Procedure in Federal Courts, § 6:24 (2013) (citations omitted).

Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 779 (W.D. Pa. 2013).

> **C.    A REMAND IS NECESSARY TO PERMIT THE ALJ TO MORE FULLY ADDRESS AND DEVELOP THE MEDICAL OPINION EVIDENCE**

Judged against these legal guideposts, we conclude that a remand of this case for further assessment of the medical evidence is necessary.  The medical record in this case contains substantial evidence supporting Squier's claim of disability.  This disability claims rests on four separate factual pillars each of which appears to be mutually supportive of this claim.

First, Squier has testified and provided activity reports which described the significant limitations he experiences daily due to neck, back and shoulder pain.  (Tr. 23-24.)  These reported limitations are inconsistent with a finding that Squier is capable of performing light work full-time.

This subjective pain testimony is then corroborated by clinical testing data provided by Dr. Vegari.  This data includes MRI results, EMG tests and other medical examinations, all of which confirmed the existence of a constellation of medical conditions, including  multi-level lumbar disc bulging, spinal stenosis, multi-level

cervical root tenderness, arthritic conditions, carpal tunnel syndrome, muscle spasms, tendonitis, and rotator cuff injuries.  (Tr. 600-626.)

Dr. Vegari's clinical findings, in turn, were consistent with the medical impressions of a pain management specialist who treated Squier, and included a finding of significant functional disability.  Specifically, Dr. Artamonov's clinical impression was that Squier was experiencing a constellation of medical problems, including:  chronic spinal pain; spinal facet joint syndrome; Secondary myofascial pain syndrome; chronic cervicalgia; chronic intermittent opioid use; and "significant functional disability."  (Tr. 676.)

Finally, Squier's treating neurologist, Dr. Maghsoudlou, has twice submitted impairment questionnaires in May and November of 2012 in which this physician opined that Squier was totally disabled due to this chronic back pain.  (Tr. 633-641, 642-649.)  According to Dr. Maghsoudlou , in an eight-hour workday, Squier could sit for a total of less than one hour and stand or walk for a total of less than one hour. Squier could only occasionally lift or carry five pounds; was markedly limited in using his upper extremities for reaching and for grasping, turning or twisting objects. He was moderately limited in performing fine manipulations; could not push, pull, kneel, bend or stoop; and was deemed unfit by the doctor for work in a full-time competitive job.  (Id.)

21

The Commissioner points to very little affirmative medical proof which can be arrayed against this body of medical evidence.  The reason for this factual asymmetry is simple and rests on a choice made by the Commissioner during these administrative proceedings:  "The record does not contain an assessment of the claimant's physical limitations from a state agency medical consultant."  (Tr. 27.)

Given the current state of the evidence, the ALJ's judgment and discretion was hobbled in ways which now compel a remand of this case for further proceedings. In light of the substantial evidence supporting Squier's claim, and the lack of any competent countervailing medical opinion evidence, the ALJ's decision in this matter cannot rest upon independent competent medical opinion evidence.  Rather, the ALJ's decision was limited to a critique and disbelief of Squier's medical evidence, coupled with a residual functional capacity assessment that was cobbled together without any systematic, coherent, underlying medical support.

In our view disbelief of the evidence is not a substitute for substantial evidence, the legal benchmark by which ALJ decisions are measured.  Indeed, this case aptly illustrates why more than mere disbelief of medical evidence is needed to sustain an ALJ decision in this field.  In his opinion rejecting the medical opinion of Dr. Maghsoudlou, the ALJ cites several grounds for his disbelief of these opinions, none

22

of which are ultimately persuasive and none of which rise to the level of substantial evidence supporting a finding that Squier can perform light work.

First, the ALJ suggests that Dr. Maghsoudlou's opinion deserves little weight because it is unsupported by medical and clinical testing data.  While it is true that Dr. Maghsoudlou did not provide extensive treatment notes, thorough medical documentation of Squier's severe medical impairments does exist in this case.  This data provided by Dr. Vegari, and  includes MRI results, EMG tests and other medical examinations, all of which confirmed that Squier suffered from an array of painful neck, back and shoulder conditions, including multi-level lumbar disc bulging, spinal stenosis, multi-level cervical root tenderness, arthritic conditions, carpal tunnel syndrome, muscle spasms, tendonitis, and rotator cuff injuries.  (Tr. 600-626.)

Moreover, the ALJ's disbelief of Dr. Maghsoudlou's opinion seems to rest on factual premises which are contradicted by the ALJ himself within the body of his opinion.  For example, ALJ's assertion that this opinion deserves little weight because there were no MRI reports on file for Squier after August 2010, was contradicted by the ALJ in his decision, which actually described the results of several MRIs undertaken in May 2011. (Tr. 26.)  Similarly, the ALJ's citation to an alleged discrepancy in Dr. Maghsoudlou's treatment history for Squier was clearly explained by the ALJ in his opinion, where the ALJ stated that the doctor first saw

23

Squier in 2010 in the emergency room following an accident, and then renewed treatment of Squier in 2012. (Tr. 26.)

Furthermore, the ALJ's disbelief of this medical evidence also fails to consider or address one additional, material component of this proof. In particular, the ALJ's treatment of the information provided by Dr. Artamonov the pain management specialist who treated Squier is materially incomplete. As we have noted, Dr. Artamonov's clinical impressions of Squier were consistent with the test results obtained by Dr. Vegari, as well as the opinion of Dr. Maghsoudlou, and included a finding of "significant functional disability." Specifically, Dr. Artamonov's clinical impression was that Squier was experiencing a constellation of medical problems, including: chronic spinal pain; spinal facet joint syndrome; Secondary myofascial pain syndrome; chronic cervicalgia; chronic intermittent opioid use; and "significant functional disability." (Tr. 676.)

While the ALJ alludes to some of Dr. Artamonov's clinical findings in his opinion, (Tr. 25.), notably the ALJ makes no mention of the doctor's conclusion that Squier experienced "significant functional disability." (Tr. 676.) This silence defeats any reasoned assessment of this aspect of the ALJ's opinion, since "[i]n the absence of s[ome analysis by the ALJ], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d

24

700, 705 (3d Cir. 1981).  Mindful of the fact that "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'  Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)," Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), we find that the complete failure to address this evidence in any fashion also compels a remand of this case for further proceedings.

Given the flaws inherent in the ALJ's treatment of this medical evidence, we find that this evidence is insufficient to allow us to conclude that "substantial evidence" supports the ALJ's decision to reject these examining medical opinions. In sum, because the ALJ's decision is not adequately explained or supported in the record before us, we conclude that the case should be remanded in order for the ALJ to re-assess this evidence, and the parties to marshal additional medical evidence, if necessary and appropriate.  In sum, case law calls for a remand and further proceedings by the ALJ in this case further assessing this claim under the five-step sequential analysis applicable to such claims, expressly addressing this medical evidence, and perhaps further developing the medical record.  However, nothing in our opinion should be construed as suggesting what the outcome of that final and full analysis should be.  Rather, that final assessment of the evidence must await a thorough consideration and development of this evidence.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's complaint be REMANDED for further consideration of the medical evidence.

An appropriate form of order follows.

So ordered this 7th day of July, 2015.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

26